# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE/OPELOUSAS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO.  09-CR-0132** |
| **VERSUS** | * | |
| **CHEVRON USA, INC.** | * | **MAGISTRATE JUDGE HILL** |

## MEMORANDUM ORDER

Defendant, Chevron USA, Inc. ("Chevron"), appeared on Friday, July 24, 2009, before the undersigned to enter a plea of guilty to a Bill of  Information filed on June 24, 2009.  The Information charged one count of violating the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. §§ 703, 707(a), a Class B misdemeanor. The government and Chevron have entered into a plea agreement regarding the alleged violation.[1]  At the plea hearing, the undersigned refused to accept the plea of guilty.  The undersigned informed the parties that the undersigned was unsure whether or not the stipulated factual basis[2] for the plea was legally sufficient under Fed. R. Crim. Proc. 11(b)(3) to support the guilty plea.  The undersigned then ordered the government to file a memorandum of law,[3] addressing the sufficiency of the factual basis to support Chevron's guilty plea.  Pursuant

---

[1] Rec. Doc. 5.

[2] Rec.  Doc 5-3.

[3] See Minutes, rec. doc. 4.

to this Order, a memorandum was filed by the government. [rec. doc. 6].  Chevron has filed no response, nor any additional pleading.

## STIPULATED FACTS IN SUPPORT OF GUILTY PLEA

Defendant, Chevron, is a corporation engaged in the production of oil and gas. Chevron and the government entered into a negotiated plea agreement pursuant to which the corporation was charged, by Information filed on June 24, 2009, with one count of violating the MBTA, 16 U.S.C. § 703, 707(a), a Class B misdemeanor.  The essential elements which must be proven in order to support a guilty plea are: (1) taking, which is defined to include killing or wounding, (2) a migratory bird, (3) without being permitted to do so.

As part of the plea package, a written stipulation of facts to support the plea was entered.  The stipulation sets out the facts as summarized below:

> Beginning approximately in the month of March, 2005, and continuing until at least November, 2006, Chevron owned and operated an oil rig which was under construction on an exploratory oil and gas well known as "Blueberry Hill No.1," in state lease 340, which is located in the coastal waters of Vermilion Parish, State of Louisiana.  The drilling rig became operational on or about November 7, 2006.

> On June 17, 2005, Chevron fitted the wellhead with a customized steel structure known as a "caisson," which was designed to protect the wellhead from damage due to contact with boats.  Once installed, the caisson resembled a large steel pipe surrounding the circumference of the outer wall of the wellhead, beginning a short distance beneath the surface of the water and extending up out of the water approximately six feet, toward the drilling platform of the rig.

-2-

On November 7, 2006, one of Chevron's operators on the Blueberry Hill well discovered the carcasses fo 35 dead Brown Pelicans that had been entrapped and died in the space between the inner wall of the caisson and the outer wall of the wellhead.  At that time, eleven live Brown Pelicans were also found and rescued from the caisson.

After being notified of the incident, Chevron promptly conducted its own investigation and shortly thereafter notified the United States Fish and Wildlife Service ("USF&W") of the incident.  Chevron provided USF&W with a detailed report of its internal investigation, including photographs and witness names.  Chevron also provided USF&W with blueprints for a remedial steel grate, which it fabricated and installed to prevent recurrences of the incident.  The Brown Pelican is a species protected under the MBTA.  At no time has Chevron had a permit to take, posses, capture, wound or kill Brown Pelicans.

## ANALYSIS

Fed. R. Crim. Proc. 11(b)(3) provides as follows:

**Determining the Factual Basis for a Plea.** Before entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea.

It is axiomatic that unless there is a sufficient factual basis to support a plea, that a plea cannot be accepted by the court.

There is no question that brown pelicans are migratory birds covered under the MBTA.  Of course, Chevron is not permitted to "take" migratory birds.  The sole issue here is whether or not the stipulated facts show that Chevron is guilty of "taking" the brown pelicans.  The government notes that the word "take", as that term is used in the MBTA, means to "pursue, hunt, shoot, wound, kill, trap, capture, or collect", or attempt to do any of those things.  50 CFR § 10.13.  Those words are not further defined in the

-3-

regulation.

The government's position is that this Class B misdemeanor is a "strict liability" offense.  The government states that it relies on the wording of 16 U.S.C. § 707(a) and the decision of the Fifth Circuit in *United States v. Morgan*, 311 F.3d 611, 615-616 (5th Cir. 2002) in support of that position.[4]  The Government's position is that the open caisson was "an attractive and deadly nuisance" and that Chevron's use of the caisson resulted in the killing of the pelicans, which made Chevron strictly liable and therefore guilty of a federal criminal offense.[5]

Section 707(a) provides as follows:

> Except as otherwise provided in this section, any person, association, partnership, or corporation who shall violate any provisions of said conventions or of this subchapter, or who shall violate or fail to comply with any regulation made pursuant to this subchapter shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not more than $15,000 or be imprisoned not more than six months, or both.

As can be seen from a simple reading of the section (the argument of the government not withstanding), nowhere does this statute address any scienter requirement, much less provide that the offense defined by the section is a "strict liability" offense.

---

[4]Rec. Doc 6, p.4.

[5]Rec. Doc 6, p. 11.

Somewhat similarly, the government's reading of *Morgan* is much broader than warranted by the plain language of the decision.  In *Morgan*, the Fifth Circuit held that possessing migratory game birds exceeding the daily bag limit in violation of the MBTA and its attendant regulations was a strict liability offense.  311 F.3d at 616.

However, the Fifth Circuit carefully limited its decision to the facts of that case and said,

> Dr. Morgan did not base his defense or appeal on the *meaning* of "possession" under § 703.  Thus, our opinion does not address whether *some types of possession of migratory birds might be insufficient* for §703 liability.  We limit our review to the issues and facts presented in this case. (emphasis added)

311 F.3d at 616.

The facts in *Morgan* are in no way similar to those in this case.  In *Morgan*, the defendant was found in possession of two ducks over the daily bag limit.  The defendant admitted that he knew that he was in possession of birds in excess of the legal limit, but defended his conduct by explaining that his dog had retrieved birds shot by other hunters, because the dog was poorly trained. 311 F.3d at 613.

The regulation at issue in that case was 50 CFR § 20.35 which provides, in pertinent part, that no person "shall possess, have in custody, or transport" more than the daily bag limit of migratory game birds.  The defendant knowingly reduced to his possession two birds more than the daily bag limit, thus violating the regulation and § 703.  The court reviewed the case law in the area, recognizing that a majority of the

circuits that had addressed the issue had held MTBA violations to be "strict liability" offenses.

At least in hunting over "baited fields" cases, the Fifth Circuit recognized that it had been in the minority by requiring proof that a hunter knew, or reasonably should have known, that he was hunting over a baited area before he could be found guilty of the offense.[6]  311 F.3d at 614.

Prior to the congressional amendment of 16 U.S.C. § 704(b)(1), the Fifth Circuit rule in "baited  fields" cases, was that strict liability did *not* apply in this class of criminal case.  *United States v. Delahoussaye*, 573 F.2d 910 (5th Cir. 1978); *followed in United States v. Sylvester*, 848 F.2d 520 (5th Cir. 1988); *United States v. Adams*, 174 F.3d 571 (5th Cir. 1999); and *United States v. Lee*, 217 F.3d 284 (5th Cir. 2000).

The government acknowledges that there is no Fifth Circuit case specifically on point, that is, that has held that the offense which Chevron is accused of committing is a "strict liability offense" under the facts presented here.  The government relies on several cases from other circuits where the defendants' activities, though not expressly directed at the taking of any wildlife, nevertheless had the incidental effect of killing protected species.  *See, United States v.  FMC Corp.*, 572 F.2d 902 (2d Cir. 1978); *United States v. Corbin Farm Service*, 444 F.Supp  510 (E.D. Cal. 1978); *United States v. Moon Lake Electrical Associates Inc.*, 405 F.Supp  2d 1070 (D. Col. 1999); *and United States v.*

---

[6] In 2002, Congress amended 16 U.S.C. § 704(b)(1) to adopt the Fifth Circuit rule.

*Apollo Energies Inc.*, 209 WL 211580 (D. Kan. 2009).

It is clear and that the provisions of the MTBA were designed to deal with persons who hunt or trap migratory game birds.  The regulations implementing the treaty deal with criminal penalties for hunting out of season, hunting with certain illegal shot, hunting with an unpluged shotgun, exceeding the daily bag or possession limit, *etc.*  It is clear that these regulations are intended to apply to acts which, knowingly done, result in violations of the regulations.  These regulations were clearly not intended to apply to commercial ventures where, occasionally, protected species might be incidentally killed as a result of totally legal and permissible activities, as happened here.

Several of the cases relied on by the government involve factual situations where criminal sanctions were clearly proper, that is, cases where the use of prohibited pesticides or similar toxic substances caused the death of protected species.  Not only is it entirely foreseeable, in cases such as those, that the death of protected species might occur, the death of those birds resulted from a prohibited act.  There was no prohibition cited by the government to Chevron leaving its caisson uncovered.  From the stipulated facts, it appears clear that these birds died as an unintended consequence from the legal, and widely accepted, use of a caisson to protect the wellhead, which, no doubt, is required by federal regulation.

The government's argument as to the reach of the regulation would be more compelling if it sought some type of regulatory remedy against Chevron.  It does not.

Rather, the government seeks to convict Chevron of a federal criminal offense, albeit a misdemeanor.

Since the government seeks criminal penalties, and since public opprobrium is a likely to result, Chevron, like any other criminal defendant is entitled to the rule of lenity, recognized by the Supreme Court in *United States v. Bass*, 404 U.S. 336 , 92 S.Ct. 515, 522 (1971) ("as we have recently reaffirmed, 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity' . . . 'a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so fair as possible, the line should be clear.'") (internal citations omitted).

Did Chevron have "fair warning", by simply reading the "taking" regulation, that their uncovered caisson, which was required to protect the wellhead, exposed them to federal criminal prosecution if brown pelicans became trapped and died?  The posing of the question supplies the answer: No.

Even if the statute merely required foreseeability to support a conviction (which the undersigned believes is incorrect), the undersigned is at a loss to see how Chevron should have reasonably foreseen the danger to brown pelicans from these uncovered, perfectly legal, widely used caissons.[7]

---

[7]It should be remembered that Hurricane Katrina struck the Louisiana Gulf Coast on August 29, 2005 and Hurricane Rita struck the Louisiana Gulf Coast on September 23, 2005.  Thus, both storms came ashore shortly after the caissons were installed and before the pelicans were discovered by Chevron personnel.

The government counters that the Congressional intent expressed in the passage of the Incidental Taking of Migratory Birds During Military Readiness Activities Amendment ("Incidental Taking Amendment"), Pub.  Law 107-314, 16 Stat. 2509 (Dec.2, 2002) supports its position that Congress intended these offenses to be "strict liability" offenses. [rec. doc. 6, pp. 9-11].

Initially, the government ignores the long recognized rule that the "views of some Congressmen as to the construction of a statute adopted years before by another Congress have 'very little, if any significance.'"  *United States v. Clark*, 445 U.S. 23, 33 n.9, 100 S.Ct.  895 (1980), (*quoting United States v. Southwestern Cable Co.*, 392 U.S. 157, 170, 88 S.Ct. 1994, 2001, 20 L.Ed.2d 1001 (1968) *in turn quoting Rainwater v. United States*, 356 U.S. 590, 593, 78 S.Ct. 946, 949, 2 L.Ed.2d 996 (1958).

Secondly, the language relied upon by the government seems, by-and-large, to simply recognize that most courts, when faced with the issue, have held that these offenses have been treated as "strict liability" offenses, not they should be "strict liability" offences under all circumstances.  Such a construction would mean that Congress intended, for example, to allow the government to criminally prosecute an automobile driver if a protected species was killed when it flew into the driver's windshield, or to criminally prosecute a home owner, if a protected species was killed when it flew into a

picture window at his home.[8]

Finally, the government relies on the court's decision in *United States v. Apollo supra.,* in support of its position.  There, the court held that the use of "heater treaters" in the processing of crude oil which resulted in killing hundreds of birds, including some protected species, constituted a criminal violation.

To the extent that the court's decision in *Apollo* is inconsistent with the reasoning in this case, the undersigned simply declines to adopt the reasoning and rationale of that decision.

For the above reasons, the undersigned concludes that the stipulated facts filed at the plea hearing are insufficient to support a guilty plea in this case.  Absent a specific holding by the Fifth Circuit, the undersigned declines to extend the Fifth Circuit's application of strict liability under the MBTA to include the conduct of Chevron as set out in the stipulated facts of this case.

---

[8]The government's response that prosecutorial discretion is sufficient to protect the innocent in these situations is scant comfort; just ask Chevron.

## CONCLUSION

For the above reasons**,** the tender of the plea of guilty by the defendant, Chevron,

to the Information is **denied**.

October 30, 2009, Lafayette, Louisiana.

_C. Michael Hill_
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE